All right. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd District is now open. Pursuant to adjournment, the Honorable Susan Fay Hutchinson presiding. Please be seated. Your Honor, this is the first case in the morning called 212-0358, People of the State of Illinois v. Andrew Villareal. On behalf of the Avalon, Mr. Scott Jacobson. On behalf of Mr. Villareal, Mr. R. Christopher White. Good morning, Mr. Jacobson. Good morning, Your Honor. And Mr. White. May it please the Court. I believe that there are two issues presented in this case. The first would be the State's contention that the trial court's ruling regarding the sufficiency of the defendant's Miranda warnings was against the manifest weight of the evidence. The second issue, as I spoke to counsel about this morning, is something that did not receive enough treatment in the briefs, and I personally apologize for that. And the second issue would be that the trial court's ruling regarding the suppression of the second and third disks was also against the manifest weight of the evidence, particularly in line with the trial court's finding that there were no coercive statements that were made to the defendant. I would submit that that issue can either be addressed by this Court or clarified by the trial court on Greenman, but nevertheless, with your permission, I proceed into the first issue. The State submits that the Miranda warnings that were presented in this case were unquestionably sufficient. Were Miranda warnings even required? Was there a finding that the defendant was in custody? No, there wasn't. I think at some point, though, the State had conceded, essentially, that the defendant was in custody, and the parties turned, of course, to the issue of the interrogation and then, you know, the sufficiency of the warnings. I think that's where things got led astray in this case. But did the Court make a finding that the defendant was in custody? You know, that's a good question. I don't recall. I don't recall the trial court explicitly. Was it the purpose of Miranda to ensure that the coercive atmosphere of custodial interrogation was not going to interfere with the person's voluntary confession? Absolutely. I would say only, in my recollection, because the State had conceded that below, the defendant was at the police station. He had been—I'm not sure if he had been handcuffed prior to being brought there, but the nature of the interview was such that, you know, for better or for worse, the detective mirrored that as the defendant. And I believe that to the extent Miranda warnings were required, Miranda was complied with in this case when the officers gave their warnings. And essentially, the Court said that in ruling, maybe not that he was in custody, but that he was not coerced and it wasn't against his will. Correct. That can relate back to what the Court thought or the concession that the State made, that they were given, they were needed, whatever. Absolutely, yeah. I think, to me, the more compelling issue, though, is the trial court's decision that the first reading of the defendant's Miranda warnings were insufficient based on the exchange in which the defendant mentioned a State's attorney. Obviously, that was—even though the majority of the issues located below dealt with coercion, that was ultimately the way in which the trial court resolved the case, and that is what the State is challenging on appeal. I don't know how to say it any other way other than the way the Supreme Court did in California v. Price Act, which is, here the Miranda warnings touched all the bases that they were required to touch. The police informed the defendant of his rights thrice, but particularly during the first reading, they had a back-and-forth exchange with the defendant to make sure that this 17-year-old, educated, well-spoken juvenile understood his rights. A viewing of the videotapes—I'm sure this Court has seen them, of course— a viewing of videotapes shows that whether or not a defendant in the abstract may be misled by Miranda isn't really the issue. The fact of the matter is that this defendant clearly understood his Miranda warnings as they were read to him. So I've argued this is a manifest weight issue because I think the trial court's finding goes to this particular defendant, but I think the trial court, in essence, misapplied the law when it began questioning the sufficiency of the Miranda warnings and then came up with this decision that the second and third readings didn't cure the defect in the first reading. I argue this is a manifest weight issue because I see it as pertaining to this defendant, this well-spoken, educated defendant who was able to stonewall the police when he wasn't speaking and when he did speak, finally, bat them around for hours regarding what occurred in this situation. Was the trial court correct when he indicated on the record that when someone who's being given Miranda does not understand the warning, that the police have an obligation to clarify? In short, no. I think what the trial court did was it blended the inquiry regarding equivocal indications of Miranda rights versus the sufficiency of the Miranda rights as read to the defendant in this case. I would note that if the police officers and cases from Illinois and the United States Supreme Court are, of course, in lockstep on this, but if the police officers had simply done a rote reading of the defendant's Miranda rights and asked him if he understood and he nodded or said, uh-huh, that would have been unquestionably sufficient under anybody's version of Miranda. Here, I think the officers took the time and effort to make a more detailed inquiry to make sure that the defendant understood the first reading of his Miranda rights. In short, I think the trial court's ruling, not only in this case but as a matter of policy, in essence penalizing the state and the detectives for being more thorough than what might ordinarily occur, has significant public policy implications beyond this case. Well, it's a little bit like when we tell judges to make a record. We want to know what they did, but when they tell us, we often find that they made a mistake. Yes. So it's very similar in that regard. What about language in the Redmond case, although it's older and some of it is not applicable today, that the court there found an intelligent conveyance of the accused rights is mandated? And that doesn't seem to be one of the challenged issues in that particular case. Oh, I'm sorry, in the context of Redmond. In Redmond, our defendant there had some intellectual issues. Yes. That we don't necessarily have here, but we have a youthful offender. We have a new offender, allegedly newer, not skilled in the ways of the court. Well, we know he was on juvenile probation, right? Yes. What was not clear from the record, I mean, so we know he's gone through the court system before. We know he can identify a prosecutor and a public defender, at least in the abstract. I don't believe there was evidence submitted that he had his Miranda rights necessarily before. He was a member of a street gang, though. Yes, he was. Can we infer anything from that that he may very well have some knowledge of law enforcement procedures? From gang membership alone, I mean, whether he could be the smartest member of the gang, he could be one of the weaker ones intellectually. I don't know that it would be fair to make that inference. I think it's certainly important. I don't think anything speaks to the clarity of the defendant's understanding, anything more than the defendant and his conduct in the interview room. I mean, whether or not it's possible for a defendant to be misled by a reading of Miranda rights or whether or not having to go through the juvenile system means he's on notice as to what his Miranda rights are, those are more general implications that I think are certainly favorable to the State. After the oral conversation, then a written Miranda is presented to him? In the first reading, I think the oral conversation is occurring. He has his copy of the written waiver form, and I think after the entire reading it occurred, then they went back through it and he initialed next to each one. And the written warnings clearly convey the terms lawyer. Yes. They have a lawyer present with you. Correct. In short, I know it's very difficult to make a manifest weight argument. That said, I don't think it's difficult in this case at all to make a manifest weight argument. Here, the overall weight of the evidence was that the defendant read his Miranda warnings and he understood them. I don't see any basis for a contrary conclusion. What about the detective's statement? I mean, the defendant says that if you get a state's attorney or something. Now, the detective said, well, that's saying that before we talk to you, he can be with you while we're talking to you. How does that clarify anything? Who's the he? Less than artful pronoun usage, certainly. I'll concede that right off the bat. I think if you look at the conversation, I mean, you know, obviously looking at the transcript is one thing. We may all draw different from, you know, looking at the transcript of it. But looking at the interview itself, I mean, this was a very quick back and forth exchange. I don't think it I don't I don't I don't think the defendant was providing an exhaustive list of attorneys. And I don't think the detective took it that way. I think it was just the defendant inartfully said state's attorney or somebody or somebody or something. And then Detective Posley, I think, dropped right back into the previous Miranda warning that they'd given him regarding the presence of counsel. And so I think, obviously, his pronoun usage went to counsel defendants, counsel who could be present in the room with him, and that he could be appointed for the purpose of being present in the room with him as well. Like I said, less than artful pronoun usage. But I don't think any of that was enough to prevent the defendant from understanding his Miranda rights. And it certainly didn't derail the interview in this case. Was it a deceptive pronoun usage? I well, OK, I don't believe so. After viewing the tape, I don't think there was any basis. I don't think Detective Posley was out to deceive the defendant at all. He was the juvenile officer. I mean, they were both juvenile officers, but Posley was the assigned juvenile officer in this case. I think he acted in accordance with that function in attempting to make sure that the defendant understood his Miranda rights. Was it the best clarification? No. Was it a model of how Miranda rights should be given? Probably not. But nevertheless, it was sufficient. And before each of the successive interviews, he was given verbal and written Miranda warnings again? Correct. Yes, Your Honor. So it's a total of three. It's a total of three. But the trial court's ruling essentially was that the defendant's reference to a state's attorney, because police did not sufficiently clarify that enough, again, I think hewing more towards the invocation aspect of Miranda rather than the sufficiency of the warnings issue, legal issue, the trial court basically derailed everything that came after this, or said that this exchange derailed everything that came afterwards. The second and third reading didn't cure the first reading. Now, I don't think that's, of course, the legal requirement, but unquestionably, the second and third readings were flawless. I mean, even the defendant didn't challenge those. And to the extent that we were talking about the possibility of Detective Posley attempting to deceive the defendant, well, that wasn't even the original basis for the defendant's claim. The defendant's claim was that, off the record, things occurred with Detective Peraza or that Peraza may have been deceiving him and that Peraza had this, as you know, felony stalking complaint that was out there, which ultimately has been resolved in his favor. But nevertheless, even the defendant was not making those arguments. The defendant was just saying, I was misled. I couldn't invoke because I didn't understand them. And in short, I think in the trial court, the defendant protested too much, essentially. I think the viewing of the videotape belies the defendant's assertion that he did not understand Miranda. And to the extent the trial court made that ruling, I think it's more than against the manifest weight of the evidence. And the trial court saw the video? Yes. The trial court saw all three, correct? Correct, yes. And that goes to your second issue. Yes. The second issue, again, my treatment of the briefs aside, I think the second issue is just as important. You know, waiver is binding on us. It is, of course, not binding on you. And I think having the record sufficiently presented to you, you can take a look at what occurred both in Detective Peraza's testimony and the defendant's testimony and then also take a look at the videotape itself. The trial court basically said that the second and third interview were out or could be used for impeachment purposes only because even though the detectives didn't make coercive statements to the defendant, as the trial court found, they nevertheless made off-camera statements to the defendant. And in short, the sole basis for the trial court's decision to suppress the second and third disks or the second and third interview tapes was this perceived change in the defendant's demeanor from when he walked out of the interview room at the end of the first interview to when he walked back in at the beginning of the second. In short, I would ask you again to look at the videotapes. There was not a significant change in the defendant's demeanor. All right. Well, not a significant change. Other than that, how would you – let's hear your description of it. My description of it is – Well, he was calm the first time around. He seemed to be reasonably calm. He seemed to be reasonably thoughtful, as you said. Sure. He could tell what was going on. What happened in basically I think would be the third one? I think it was at the start of the second one. All right. Because I believe at the start of the second one, he comes back into the interview room. He puts his head down. And he cries. He cries for a little bit, about 30, 45 seconds or so. Composes himself. Almost simultaneously, the detectives walk back into the room. Any number of things could have happened. Detective Posley testified that he brought the defendant food, that they were talking, not about the case, and that the defendant – he had asked the defendant if he wanted to talk to him again, and the defendant said yes. They bring him back into the interview room. Any number of things could have happened. The trial courts – the defendant testified that Posley had said something to him about reduced charges or made him a plea agreement or whatnot. First of all, that would not necessarily be coercive per se. And the trial court for whatever reason found Detective Posley's testimony that he did not make any of those types of statements incredible because the trial court said, well, clearly something had to happen. The problem is from this record, from the record developed by the parties, the record presented to the trial court, the witnesses that testified, I don't think there's any basis for the trial court's conclusion that something necessarily happened other than normal behavior that might occur in a custodial situation. I mean, at the end of the first interview, the defendant was taken out. He was placed in a cell. It's certainly possible that the gravity of the situation set in on him, and he did ultimately change his behavior, not significantly. I mean, he was just as firm with them in the second and third interview after crying as he was deadpan in the first interview. But crying doesn't seem to match the first interview in a lot of ways based upon even your explanation of the first interview. As you watched the first interview, it's clear he understood what his Miranda warnings were. He didn't use the word savvy, but he knew. I think I said that he had stonewalled them. He did say that. Yeah. But if you look at his behavior while he was doing it, this is where the crying— I mean, his eyes were red when he was sitting there in the first interview. I think he was sufficiently—I think he was certainly—he was sad about the situation. I mean, there's no two ways about it. They're talking about his family. He's talking about his family. They're talking about his son growing up without a father. He's sort of talking with them about that. And his posture when he's turned and sort of looking away from them, I mean, he looked sad to me in that. He's being investigated for a murder, and he's aware of his complicity in it. I think all of those bespeak a defendant who might be sad. I didn't see this significant change in demeanor. What's important is the way the trial court viewed it because it's a manifest way of discussion. Well, that's true. But to the extent the trial court said, well, something had to have happened to cause this change in demeanor, I think it's incumbent upon us to look at whether or not there was an actual change in demeanor. So if there was no significant change in the defendant's demeanor, the trial court's ruling is supported only by the trial court's speculation. I would submit that after viewing the tapes, this court can rectify the error made by the trial court and restore balance to this case, and I would ask this court to reverse and remand. Thank you. Thank you. Thank you. Mr. White. Good morning. May it please the court, the counsel. Chris White on behalf of Andrew Villarreal. The state seems to focus its entire argument on the sufficiency of the warnings. It asks, did the officer give sufficient warnings, and would a similarly situated defendant with the same level of experience, same education, literacy level, understand those warnings? According to the state, the officer's work is done as long as they recite the warnings. Although, as Mr. Jacobson just mentioned here, that what's important here is not whether a defendant would understand the warnings. It's whether this defendant understood the warnings, and I think it's pretty clear from the record here and the trial court found so, that this defendant had questions about those warnings. Do we know from his limited juvenile court experience if he had been Mirandized in the past? I don't believe he had. I know there was testimony. I think they may have asked him that during the suppression, hearing whether he had ever been given his Miranda warnings, so I don't remember if it was him or if it was one of the state's witnesses, one of the detectives, but I do remember there was testimony that he hadn't been exposed to Miranda warnings before. And as the state mentions, in fact, that Miranda itself warns against the finding of an application of what it calls talismanic incantations, would not be sufficient, and then goes on to argue that the application of these very talismanic incantations is sufficient. And I think once the defendant here asks or makes comments like the statement, you know, I'm allowed a state's attorney or something, or something may even be more damning here than the state's attorney verbiage that the state chalks up to inartful pronoun usage. What about the counter to that, that the written warnings were clear? The written warnings that the defendant executed three times were clear. His own lawyer, that he had a right to have a lawyer present, his own lawyer. And the fact that after that preliminary discussion, this topic doesn't come up again during the first, second, or third interview. Well, to that extent, the first one was clear. If you use that, the fact that he asked a question about the first one, which is you have a right to a lawyer, you know what that means, and then he says no, that was simply repeated. It was repeated in the second time, the third time, whether he's asked it the fourth, fifth, twelfth, fifteenth time. It was never addressed. The questions that he had were never addressed. Do you concede that he was not in custody when he first, during the initial phase of the interview? The initial one, no, I would not concede that. He was there for eight hours. There was no indication that he was free to leave. The state seems to have conceded the fact that he was in custody. Just looking at the tape, for that matter, shows that this is not someone who can just get up and walk out. He certainly was there being questioned about this very serious offense. During the initial interview? The initial interview, although it wasn't, I don't believe it was a murder at that point, but it was still certainly a very serious crime that he was being interrogated about. And I don't think simply also with respect to the written warnings, that after he's given these warnings again, the defendant has raised some questions indicating his lack of understanding for the officer to then say, do me a favor and initial these. I don't think that's really enough to assume that the defendant then read through all of the warnings that he previously didn't understand and then just went ahead and initialed because now he had some moment of clarity. I think it's clear from the record here that he didn't understand not only, more than just the difference between the state's attorney and a public defender, which he was asked about later during the suppression hearing. And at that point, he seemed to indicate one represents the people, one represents the state. Whatever that means, we don't know. The court was really in the best position at that point to determine factors of credibility and what he meant at that point. But he did not, he wasn't told that he'd have a right to appoint a counsel before questioning either, which is very significant here because just because the police say you have a right to have someone here with you, he or whomever they're talking about, he doesn't then know that, oh, I can quit talking now and because I don't have any money, because that right to counsel doesn't really mean anything unless you're aware that you're going to have an appointed counsel. I think it shows there that he didn't know that he was entitled to counsel, more than just whether or not that person is called a state's attorney or a public defender or a private lawyer or whatever it may be. He didn't understand the fundamental aspect of Miranda, which is you are entitled to appointed counsel if you cannot afford counsel and that that counsel can be with you prior to and during questioning. And I don't think he understood from these comments that those were his rights. In the early Miranda cases, we were worried about ambiguity of the answer that the defendant gave, and we have an answer issue here. When we then decided later cases and the Supreme Court weighed in, there were issues about, well, let's find out how they really know and let's have them read them and ask them questions. Are we now worried about or should we be worried about the ambiguity of the answer as well? Because that's really not part of the Miranda warnings. In this case, I think we should, given the bigger picture, and the bigger picture is under Miranda itself. The purpose of this is really to convey a warning. It's not simply to recite the ten things that everybody sees on law and order. It's for these defendants to actually understand what those rights are. Now, I don't think they have to conduct some seminar in civic responsibility every time that they bring in some defendant, but they certainly, when a defendant asks a question about a particular issue, I think they're certainly obligated to clarify that. I mean, the state here says that suppression would deter law enforcement from asking these questions in order to make sure they understand their rights. Well, I think that's an extremely cynical answer. It might just have the effect of, you know, if this court were to affirm the lower court's decision, it might actually have the effect to force officers to take greater care in ensuring that defendants actually understand these rights when they are asked questions about them and not merely ignore any questions or statements that are given during that time. I think to reverse this, to say, well, there were serious concerns about whether or not this defendant, a 17-year-old sophomore who didn't have any prior Miranda experience, really understood those or not, is not really our concern. The important thing is that the officer stated two, three, four times, whatever it may be, the same Miranda warnings off the card and had him initial it. I think that's really a very hollow application of Miranda and one that shouldn't be tolerated here, particularly with the deferential standard of review of manifest weight. Well, even when we have different people coming in to do the interviews, isn't it, and having courts in the past basically relied on what happened the first time around, and if everybody said, hey, you know, and we're assuming that between interview teams, they're saying, we got the warnings, let's move on. You know, isn't that, how many times do they have to educate the defendant? Well, they made probably one good time, one valid time, one time that indicated that the defendant actually did understand them. And in most cases, granted, that's probably going to be a very difficult thing. I mean, I think as the state mentions, as soon as they read the Miranda warnings, because that's essentially what it's come down to. I mean, I think Miranda is actually factually, I believe, an encapsulation of what some police forces had been doing at that time anyway, just reading these particular rights and simply codified that. But I think once you do that properly and you don't have, I guess, more than you just don't have them agree to it, but at least you don't have them say, the defendants say, I don't understand a particular thing, or could you clarify this? Because here, when he asked those questions, there really wasn't much clarification given. It was just, well, yeah, okay, and if you could just initial this and do me a favor. I don't think that gets through the sort of technical aspect of it, the formalistic aspect of having a signed Miranda form. But it doesn't really go to the defendant actually understanding these rights. I don't think they have to do it repeatedly, but they certainly have to do it once with force or once that they clearly would understand or everyone can agree that they would understand. And Posley said, I went through it, and this is what he said. And he ultimately said, after, well, that's saying that before we talked to you, he could be with you while we were talking to you. Defendant, oh, you understand that. Defendant, yeah. Well, again, as you asked the State, the he is very unclear. I don't know that it's necessarily deceptive on the part of the State. I think it probably is sort of in our full usage on that point. But it's more significant than that because we don't know who he is. If a defendant thinks, okay, I'm allowed to have a lawyer with me, well, that doesn't do me any good because I can't afford a lawyer. I'm 17 years old and can't have a lawyer. So it's a meaningless, what he didn't know is if you can't afford a lawyer, one can be appointed for you. And the response to that seemed to be, oh, a State's attorney. I don't think it's too much to ask the police officers in this type of situation to elaborate, spend a couple more seconds even, to elaborate that a State's attorney is the attorney who brings charges against you. You're entitled to either a lawyer of your own choosing or if you can't afford it, another lawyer. I don't think that's really asking a lot when there's a question. Perhaps not in every case, but at least when there's a question like this. Well, we know as a matter of law he would have had to have an attorney in his juvenile case because juveniles can't be there without counsel. Do we know if his counsel was appointed or was private in that matter from this record? I don't think it's specific in this matter. So if he was referring to an official attorney of some sort, like a State-paid attorney, and I realize that's a big if, and we're speculating to some degree, that would clarify that to some degree. Of course. A State-paid lawyer being a State's attorney or a public defender. And there certainly are a lot of people who think that. The public defenders work for the State, so we don't trust them either. But I think once you get into those types of analysis, as you mentioned, and that's what the State seemed to focus on too, is it could have been other things. And I think that's because of the standard of review here, the manifest way. I don't think it's good enough here to say that the defendant may have believed other things or believed these had meanings different from what the trial court believed him to be. That's not the manifest way. That's more likely than not, and it's barely that. I think we have to look at the court having observed not just the tapes, because granted, if it's just the tapes, that could possibly be the normal review. But the trial court actually witnessed the defendant, and witnessed the defendant in the suppression hearing actually testify about these very matters and when he knew things and when he didn't, because there's also a question about when he understood these rights. Did he understand them at the time he gave them, or did he subsequently understand them when he said, well, I know a State's attorney works for the people, the public defender works for the people, State's attorney works for the State. That was actually something he came up with after the initial interview. So given the fact that the trial court's finding that he did not understand his rights was not against the manifest way to the evidence, Mr. Villarreal asked that the court affirm the circuit court's suppression order. Any questions? Justice Stentz, any other questions? No, thank you. All right, thank you, Mr. White. Thank you. Mr. Jacobson, let me ask you off the bat. Yes, we can look at the tapes, the three tapes, but we have no tape of the defendant testifying. And that's something that the court took into account. How do we balance that and then look at the standard here? Well, I mean, the manifest way to the evidence, you have the balance of the defendant's testimony against the tapes. You alluded before when you were questioning the opposing counsel about the defendant, after Posey clarified, the defendant said, yeah. I would urge you to take a careful look at the defendant's demeanor when he says the word yeah, because that is in front of you. And to the extent the trial court made whatever finding it made regarding the defendant's testimony, the defendant in the crucible of the moment in that interview clearly evinced from his behavior, from his demeanor, from his statements, an understanding of what was said to him. Well, I mean, he didn't stand up and do a fist pump for him. No, no, no. He just said yeah. I'm not saying that he understood the history of Miranda. I'm not saying that he understood the interstices of the criminal justice system. What I am saying is that he understood what was said to him, and that was sufficient. I mean, it's simply put, it's not a question about, well, if the defendant says something or he offers up a bad example and then the police offer up a bad explanation, that all of a sudden for whatever reason the protections of Miranda, the dictates of Miranda have not been complied with. But you're not saying, and I think Mr. White is going to a bigger issue, but you're not saying here when he understood that if he couldn't afford an attorney, one would be appointed for him, a state's attorney or something, if he had asked for the state's attorney to come in, they wouldn't have stopped questioning him, would they? No, and there are some Fourth District cases on point that if the defendant does ask, I think I did cite one of them here, but if the defendant does ask for the state's attorney, that's significantly different than asking for his own attorney. If he had asked in that context, that would have led to an explanation. No, if you're asking for your lawyer or are you asking for the state's attorney? I didn't get to that point because he said he understood. Yeah, I appreciate you answering your own question. But that's the point, isn't it? Yeah. Did he understand or not? I think that's the main issue before this court. Of course, I submit that the trial court's decision, the defendant testified to what he testified to, the trial court observed him. You have in front of you the videotapes. I think those speak volumes where the defendant's testimony does not. In short, Miranda is designed to prevent police coercion. It is designed to prevent us from taking the state, the police, whoever, from taking advantage of suspects. The defendant was practically an adult in this case. He had no difficulties in cognition. He didn't suffer from any, apparently, and even the defense doesn't claim that he did. I think he clearly understood what was said to him. I think the tapes show that the trial court's ruling was against the manifest weight of the evidence. And, in short, based on the evidence in front of this court, I would ask you to overturn the trial court's decision and, again, send this case back to the trial court for the conclusion of the suppression hearing and the trial. The conclusion of the suppression hearing? You mean the tapes? I'm sorry, the conclusion, yes. Okay. Yeah. I think there are a lot of issues that need to be further fleshed out. Obviously, in the trial court, I think this is one of the hazards of doing a bench trial at the same time as you're doing a suppression motion. But that aside, we would submit that the trial court judge's ruling that the defendant did not understand his Miranda rights after having this exchange, after having them clarified, was against the manifest weight of the evidence. Thank you. Thank you. All right, thank you, gentlemen, for your arguments. We will take them under advisement, enter a decision in due course, and we stand now in adjournment.